Filed 2/10/23  P. v. Guzman CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE PEDRO GUZMAN,<br><br>Defendant and Appellant. | F081436<br><br>(Super. Ct. No. 04CM0295-003)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Valerie R. Chrissakis, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Poochigian, Acting P. J., Franson, J. and Smith, J.

## INTRODUCTION

In 2005, a jury convicted petitioner Jose Pedro Guzman of the first degree murder of Paul Lemos (Pen. Code,[1] § 187, subd. (a), count 1). The jury found true the special circumstance that petitioner committed the murder while engaged in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(A)).[2] The trial court sentenced petitioner to a term of life without the possibility of parole and imposed a consecutive 25-year-to-life term for a firearm enhancement (§ 12022.53, subds. (d), (e)(1)) and a consecutive one-year prior prison term enhancement pursuant to section 667.5, former subdivision (b).[3] (*People v. Guzman* (Sept. 21, 2006, F048683) [nonpub. opn.] (*Guzman*).)

In 2019, petitioner filed a petition for resentencing on his murder conviction pursuant to section 1172.6 (former § 1170.95).[4] The court summarily denied the petition at the prima facie stage finding that petitioner was a major participant who acted with reckless indifference to human life, a disqualifying factor pursuant to section 1172.6.

On appeal, petitioner contends he has established a prima facie case for entitlement of relief because the special circumstance finding cannot establish his ineligibility for resentencing as a matter of law because his conviction predates our

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The jury found true additional enhancements, as described below.

[3] Section 1171.1, subdivision (a) states, "[a]ny sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense . . . is legally invalid." Petitioner has not raised the applicability of this provision to his sentence in the trial court, and we will not address this issue in the opinion. However, petitioner retains any remedies to address this in the future.

[4] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

Supreme Court's decisions in *Banks/Clark*,[5] which clarified the meaning of "major participant" and "reckless indifference to human life."

While petitioner's appeal was pending, our Supreme Court held a pre-*Banks/Clark* special circumstance finding does not render a section 1172.6 petitioner ineligible for relief as a matter of law. (*People v. Strong* (2022) 13 Cal.5th 698 (*Strong*).) Therefore, based on *Strong*, we must vacate the trial court's order and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are from our nonpublished opinion in petitioner's prior direct appeal.[6]

"... *Accomplice Testimony*

"Laura Holt was with [petitioner], [Jose] Perez, and [Eduardo] Hernandez on December 29, 2003. They spent part of the evening drinking at someone's house in Laton, and then Holt drove the group in her car to a basketball game in Riverdale. As it turned out, they did not attend the game and after a short period of time they returned to Laton and went to the home of Jose [R.] . . . .

"Holt, [petitioner], Hernandez and Perez smoked methamphetamine with [Jose R.], joined by Anthony [Ru.] . . . . [Petitioner], Hernandez and Perez began talking about robbing someone. [Petitioner] asked [Jose R.] for a gun. [Jose R.] did not want to give it to him. [Petitioner] told [Jose R.] that he was not going to shoot the gun; he only needed it to scare someone while he robbed them. [Jose R.] gave the gun to [petitioner].

---

[5] *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

[6] We previously granted petitioner's "APPLICATION TO INCORPORATE BY REFERENCE PURSUANT TO RULE 8.147" the prior record in *Guzman*, *supra*, F048683. We provide these facts from the record for background purposes because they were cited by both parties in their briefs. However, we do not rely on these facts in resolving the issues presented in this appeal. (See § 1172.6, subd. (d)(3).)

Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended

"At trial, Holt was shown a picture of a gun, and testified that the gun looked like the gun [Jose R.] gave to [petitioner].

"Holt, [petitioner], Hernandez and Perez left in Holt's car. Holt was driving. They drove around trying to decide where to go to rob someone. While driving around, Perez, [petitioner] and Hernandez talked about the robbery. They discussed stealing a vehicle with a stereo system. They drove to Hanford to find their target. They drove around the Hanford mall parking lot to look at cars. They did not find anything that suited their purposes.

"Discussions continued, and Perez said he wanted to do a carjacking. Hernandez wanted to do a home invasion. [Petitioner] did not join in this discussion. [Petitioner] and Perez argued over who was going to possess the gun. [Petitioner] finally let Perez have his way and possess the gun. The gun had been loaded previously in the car by [petitioner].

"The group then drove to a residential area and looked around. Again finding nothing, they returned to the area of the mall. They saw a blue Chevrolet truck, lowered, with tinted windows, driven by Paul Lemos, the victim. Hernandez liked the truck and told Holt to follow it. She did. Holt parked her car nearby while Lemos drove through the drive-through at Taco Bell and purchased food.

"Holt continued to follow the truck. At one stop light the victim's truck was next to another nice truck. The group decided that the victim's truck was the nicest. Perez got out and started to go towards the truck when [petitioner] and Hernandez told him to get back in the car.

"They followed the victim in his truck until the victim arrived at his house. Holt backed the car up and stopped at the corner. She could not see the truck from her location. Perez and Hernandez jumped out and ran towards the truck. Hernandez told Holt to follow them after they obtained the truck. [Petitioner] got out shortly afterwards and stood near the car. Holt was not sure if [petitioner] stayed near the car because she was feeling ill from the drugs and was not paying attention. She kept the engine running.

"Holt heard two gunshots. [Petitioner] got in the car. Perez and Hernandez ran to the car and got in. They told her to take off. She did.

"In the car, Hernandez said that he was punching the victim. The victim was scared and crying. Hernandez told Perez he should have used his hands instead of a gun to take things from the victim. Perez stated that

4.

he thought he shot the victim in the shoulder and missed with the other two shots. Hernandez said that Perez should have taken the victim's wallet while Hernandez was punching him.

"Holt drove the group back to Laton. She was told not to say anything. Holt dropped Perez off at his house so he could change his clothes and wash up to get rid of any gun residue. Holt, [petitioner], and Hernandez drove back to [Jose R.]'s home and again used drugs. [Anthony] was still there. Hernandez and [petitioner] told [Jose R.] he needed to get rid of the gun. Perez showed up shortly thereafter. The group stayed there about an hour. During this time the gun was returned to [Jose R.]. They then decided they would go to Fresno to try and find some more drugs. Their trip was unsuccessful, and they returned to the home of [Jose R.] and used more drugs.

"Holt, [petitioner], Hernandez, and Perez left in Holt's car. They were stopped by police. When they were stopped, Hernandez ran and was not captured. The others discussed their alibi. They decided they would say that Holt had picked them up from City Lights in Fresno. [Petitioner] came up with a name he would use. Officers removed them individually from the car and separated them. They were eventually allowed to leave. Holt went with [petitioner] to his brother's house.

"Two months before trial Holt was in a holding cell. Perez, Hernandez, and [petitioner] were being held in the same area. Perez asked Holt to take back her deal and not testify; Hernandez joined in asking Holt to change her mind. [Petitioner] told her he wanted to marry her.

"... *Nonaccomplice Evidence*

"Christina P[.] knew the victim. On December 29, 2003, she had a cellular telephone conversation with Lemos while she was riding in a van. She heard a loud sigh and Lemos stopped talking. She heard the beeping sound that is made when the door to a vehicle is open and the keys are left in the ignition.

"Diana D. lived next door to Lemos. On the night of December 29, 2003, she was outside on her front porch. She heard someone say, 'F[***] you b[****], you f[***]in' scrap.' She looked and saw two men standing near each other by the back of the truck. One of the individuals had a gun pointed sideways at Lemos. Diana went inside of her house. She heard three shots. She looked out and saw Lemos fall to his knees in the driveway; the other individuals ran away. She heard two car doors close

5.

and heard a car 'screech off.' She came out of her house and saw Lemos on the ground holding the back of his head and making moaning sounds.

"When Diana first spoke to an investigator that evening, she told them she did not see anything. She was afraid. Her husband told her to tell the truth, and later that evening she told officers what she had seen.

"Diana identified Perez as the person with the gun she saw standing by the victim's truck at the time he was shot.

"Shirley V[.] was driving by the park. She drove further down the street and parked on the street near the victim's house so she could talk with a friend in the car. She saw a small white car parked on the corner. She heard two gunshots. She saw two people run to the car and get in. The car took off with the headlights off. [Shirley] followed them trying to get their license number. She stopped following the car when the car turned left towards Laton. She went back to the area and told law enforcement officers what she had seen.

"Hanford police officer [R.] Pontecorvo responded to the scene of the murder. The truck was parked in the driveway. The driver's door was open; there was a Taco Bell bag on the ground as well as a Taco Bell cup. A cellular telephone was on the ground by the truck. The[] keys were in the ignition of the truck. The stereo system in the truck was not missing. There were no shell casings in the area.

"In the early morning hours of December 30, 2003, Pontecorvo drove to Laton looking for the vehicle. He observed a vehicle that matched the description of the vehicle leaving the crime scene. Pontecorvo followed the vehicle. The occupants of the vehicle kept looking back at Pontecorvo as he followed it. Pontecorvo stopped the vehicle. One person fled the scene. He removed the other three occupants of the car. Holt was the driver of the car. [Petitioner] was seated in the front passenger seat; he misidentified himself as Alex Gutierrez. Perez was in the rear passenger seat. Holt said that she had picked up the men from City Lights in Fresno.

"Lemos died from a single gunshot wound to the left side of his head. In addition, he had swelling to his right eye that was not consistent with a gunshot wound but was consistent with blunt force trauma. A deformed slug was recovered from the victim's brain.

"Several days after the murder, a search was conducted at the home of [Jose R.]. [Jose R.] was there, as was [Anthony]. In addition, Manuel T[.] and Raul G[.] were there. Officers found weapons, ammunition, drugs,

6.

and drug paraphernalia. [Jose R.] said that he gave the gun to [petitioner] for protection but the gun was never returned to him.

"The home of Robert G[.] was searched. The weapon was not found. Several days later, Robert turned a weapon over to law enforcement. Robert is the brother of Raul G[.] and the uncle of Manuel T[.], one of the individuals at the home of [Jose R.] when it was searched for the weapon. Robert said he had received an anonymous call regarding the location of the gun. He went to the location and found the gun in a paper bag by the side of the road. He refused to provide any further details about the gun.

"Robert testified that he received a call and the unidentified male caller asked him if he was going to testify. The caller said he knew where he lived. When the gun was turned in, Robert said he got the gun from Manuel T[.].

"A criminalist test-fired the gun turned in by Robert. Because the gun was worn and old, the criminalist was not able to get nice crisp characteristics to compare to the fragment recovered from the victim, but the bullets agreed as far as land, grooves and twists and the bullet retrieved from the victim was consistent with being fired from the gun.

"Jose R[.] testified that he did not know [petitioner], did not know Manuel T[.], and did not give [petitioner] a gun. He additionally testified that he did not know Perez or [petitioner] even though there were pictures of them found in his trailer. He admitted he was convicted of possession of methamphetamine for sale and possession of a firearm as a result of the search of his house for the gun. Manuel T[.] was present when the search was conducted.

"Pontecorvo said that when officers searched the home of Jose R[.], [Jose R.] said that [petitioner] had not given the gun back to him.

"On February 22, 2004, officers went to the home of Mimi P[.] to serve an arrest warrant for Hernandez and [petitioner]. They knocked on the door. Mimi answered and said [petitioner] was inside with Hernandez. Officers posted at the rear of the house apprehended Hernandez and [petitioner] after they ignored orders to go to the ground and tried to escape.

"Mimi . . . testified that she was living with Hernandez and [petitioner] on February 22, 2004. Luis H[.] is the father of her children and also the cousin of [petitioner] and Hernandez. [Mimi] was having a relationship with [petitioner] at this time. Prior to the arrest of [petitioner]

7.

and Hernandez, [Mimi] had several conversations with them. . . . [T]he mother of Hernandez's children, was present during some of the conversations.

"During the conversations, Hernandez told them that Perez shot the person in the truck and Holt drove them. [Petitioner] said that Perez liked the victim's truck and Perez told Holt to follow it. Perez said he was going to take the victim's money and his truck. [Petitioner] also said that Perez shot the victim. [Mimi] was told that Perez told the victim to give him all of the money and the victim asked not to be killed. The victim reached for something and Hernandez said the victim was reaching for a gun. Perez shot the victim. When [petitioner] talked about the incident he cried and said he did not do it.

"Numerous law enforcement officials described contacts with [petitioner], Hernandez, and Perez involving the Laton Bulldog gang and their membership in the gang.

"[R.] Paolinelli, an expert on the Laton Bulldogs gang, testified that 'scrap' is a term used by Norte[ñ]o Bulldogs to disrespect Sure[ñ]os. The Laton Bulldogs are rivals with both the Sure[ñ]o and Norte[ñ]o gangs. It was Paolinelli's opinion that Hernandez, Perez, and [petitioner] are members of the Bulldog gang.

"An officer searched the victim's bedroom, finding nothing associated with any type of gang affiliation." (*Guzman*, *supra*, F048683, italics added, fn. omitted.)

On June 20, 2005, the Kings County District Attorney filed an amended information charging petitioner with the first degree murder of Lemos (§§ 187, subd. (a), 189; count 1) with the special circumstances petitioner committed the murder while an active participant in a criminal street gang (§ 190.2, subd. (a)(22))[7] and that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)). It was further alleged the murder was committed in furtherance of a criminal street gang (§ 186.22, subd. (b)(1)) and that a principal personally and intentionally discharged a handgun which proximately caused death to Lemos

---

[7] Upon stipulation and motion by the district attorney this special circumstance was dismissed prior to jury deliberations.

(§§ 12022.53 subds. (b), (c), (d), (e)(1), 12022.5, subd. (a)). Finally, the information alleged petitioner suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), and had served a prior prison term (§ 667.5, former subd. (b)).

On July 15, 2005, the jury convicted petitioner[8] of first degree murder and found true the special circumstance that the murder was committed during the commission or attempted commission of a robbery (§ 190.2, subd. (a)(17)(A)). The jury also found true the enhancements the murder was committed in furtherance of a criminal street gang (§ 186.22, subd. (b)(1)) and that the principal personally and intentionally discharged a firearm causing death to Lemos (§ 12022.53, subds. (d), (e)). In addition, petitioner admitted the allegations that he suffered a prior strike conviction and served a prior prison term. (*Guzman*, *supra*, F048683.)

On August 12, 2005, the trial court sentenced petitioner to a term of life without the possibility of parole with a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)) and a consecutive one-year term for the prison prior (§ 667.5, former subd. (b)). As to the gang enhancement (§ 186.22, subd. (b)(1)), the trial court sentenced petitioner to the upper term of 10 years, but stayed the sentence pursuant to section 654.

In petitioner's direct appeal, he argued in relevant part there was insufficient evidence to support the jury's true finding on the robbery special circumstance. (*Guzman*, *supra*, F048683.) This court disagreed and concluded substantial evidence existed to support the finding. (*Ibid.*) Specifically, this court stated:

> "In this case, [petitioner] was the individual who acquired the gun and loaded it. He participated fully in the plans to commit an armed

---

[8] Petitioner and Hernandez were tried together and both were convicted of first degree murder and additional allegations. Perez was tried separately and was convicted of first degree murder, two special circumstances, plus firearm and gang allegations. Both Hernandez and Perez were the subjects of separate appeals. Holt testified as an accomplice in both trials. (*Guzman*, *supra*, F048683.)

robbery. He participated in the stalking of the victim and called off Perez when he started to approach the victim on a public street. [Petitioner] got out of the car, presumably acting as a lookout, while Perez and Hernandez committed the attempted robbery. [Petitioner] heard the gunshots and jumped in the car, not offering any assistance to the victim. Under these facts the jury could properly have found that [petitioner] was a major participant and acted with a reckless indifference to human life. Substantial evidence supports the special circumstance." (*Guzman*, *supra*, F048683.)

Accordingly, this court affirmed the judgment. (*Ibid.*)

On August 12, 2019, petitioner, in propria persona, filed a petition for resentencing on his murder conviction pursuant to section 1172.6. In an attached declaration, petitioner stated that an information was filed against him that allowed the prosecution to proceed under a theory of first degree felony murder; a jury convicted petitioner of first degree murder pursuant to the felony-murder rule and/or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019. He also stated he was not the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree; he was not a major participant in the felony or did not act with reckless indifference to human life; and the victim of the murder was not a peace officer acting in the performance of his duties. Moreover, as a part of his petition, petitioner argued the evidence presented in his trial was insufficient to support the robbery special circumstance finding based on the five-factor test set forth in *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522. Petitioner did not request appointed counsel in his petition.

The district attorney filed a response arguing that petitioner is ineligible for section 1172.6 resentencing relief because he was a principal in the murder who acted with implied malice. The People additionally argued that Senate Bill No. 1437

10.

(2017–2018 Reg. Sess.) (Senate Bill No. 1437) is unconstitutional. Petitioner, in propria persona, filed a reply arguing that he is eligible for relief and that Senate Bill No. 1437 is constitutional. The trial court, without addressing the constitutionality of Senate Bill No. 1437 and without appointing counsel for petitioner, denied the petition on the basis that:

> "The California Court of Appeal, Fifth Appellate District has found that Petitioner was a major participant in a felony enumerated in Penal Code § 189(a) and that he acted with reckless indifference to human life:
>
>> " 'In this case, [petitioner] [Guzman] was the individual who acquired the gun and loaded it. He participated fully in the plans to commit robbery. He participated in the stalking of the victim and called off Perez when he started to approach the victim on a public street. [Petitioner] got out of the car, presumably acting as a lookout, while Perez and Hernandez committed the robbery. [Petitioner] heard gun shots and jumped in the car, not offering any assistance to the victim. Under these facts, the jury could properly have found that [petitioner] was a major participant and acted with reckless indifference to human life. Substantial evidence supports [the conviction].' [Citation.]
>
> "Since the record establishes that Petitioner was a major participant in a felony enumerated in Penal Code § 189(a) and acted with reckless indifference to human life in the commission of that felony, his first degree murder conviction shall stand despite the enactment of Senate Bill [No.] 1437."

A timely appeal followed. In a nonpublished opinion filed May 16, 2022, we affirmed the trial court's order denying resentencing. (*People v. Guzman* (May 16, 2022, F081436).)

On June 16, 2022, petitioner filed a petition for review arguing that a special circumstance finding prior to *Banks* and *Clark* should not preclude resentencing relief as a matter of law. On July 20, 2022, our Supreme Court granted review and deferred consideration and disposition in light of its decision in *Strong*. On December 21, 2022, our Supreme Court transferred the matter back to this court with directions to vacate our

11.

May 16, 2022 opinion and reconsider the cause in light of *Strong*. We afforded the parties an opportunity to file supplemental briefing. On January 4, 2023, the People filed a supplemental brief conceding that based on *Strong* this case should be reversed and remanded for further proceedings. Petitioner filed no response. Pursuant to our Supreme Court's order, we vacated our prior opinion in an order filed January 20, 2023. Based on the People's concession, the trial court's order denying the section 1172.6 petition is reversed and the matter remanded for further proceedings.

## **DISCUSSION**

### I.   **Applicable Law**

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The bill accomplished this task by adding three separate provisions to the Penal Code. (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).) First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842–843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless

12.

indifference to human life, as described in subdivision (d) of Section 190.2."[9] (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added section 1172.6 (former § 1170.95) to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, at p. 843.) This procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter." (§ 1172.6, subd. (a).)

"Section [1172.6] lays out a process" for a person convicted of one of the aforementioned offenses "to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, an offender must file a petition in the sentencing court averring that:

> "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine[;]
>
> "(2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[; and]
>
> "(3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)–(3); see § 1172.6, subd. (b)(1)(A); accord, *People v. Lewis* (2021) 11 Cal.5th 952, 959–960 (*Lewis*).)

---

[9] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

Additionally, the petition shall state "[w]hether the petitioner requests the appointment of counsel." (§ 1172.6, subd. (b)(1)(C).)

If a petition fails to contain the required information and the information cannot be "readily ascertained" by the court, the petition may be denied without prejudice to the filing of another petition. (§ 1172.6, subd. (b)(2).) Otherwise, counsel must be appointed, if requested. (§ 1172.6, subd. (b)(3).) The prosecutor must file a response and the petitioner may file a reply. The trial court must then hold a hearing to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subd. (c); accord, *Lewis*, *supra*, 11 Cal.5th at pp. 961–963, 967.) In making this determination, the court may rely on the record of conviction, which includes, but is not limited to, jury instructions and verdict forms. (*Lewis*, at pp. 970–971, 972.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at pp. 971–972.) "If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so." (§ 1172.6, subd. (c).)

On the other hand, if the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder[, attempted murder, or manslaughter] conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural

14.

history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) Hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of section 872 is inadmissible at the evidentiary hearing, unless made admissible by another exception to the hearsay rule. (§ 1172.6, subd. (d)(3).)

## II. Analysis

Petitioner contends the jury's special circumstance finding cannot establish his ineligibility for resentencing as a matter of law because his conviction predates our Supreme Court's decisions in *Banks/Clark*, which clarified the meaning of "major participant" and "reckless indifference to human life." Based on our Supreme Court's holding in *Strong*, we agree.[10]

Prior to *Strong*, the Courts of Appeal were split on the question of whether a special circumstance finding entered prior to *Banks* and *Clark* renders a petitioner ineligible for section 1172.6 resentencing relief as a matter of law. Our Supreme Court recently resolved this split and made clear that when, as here, a petitioner's case "was tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him from making out a prima facie case for resentencing under section 1172.6." (*Strong*, *supra*, 13 Cal.5th at p. 721.) "This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Id*. at p. 710.) The *Strong* court noted the *Banks* and *Clark* cases "both substantially clarified the law governing findings under . . . section 190.2, subdivision (d)." (*Strong*, at p. 706.) Further, the court articulated a pre-*Banks* and *Clark* special circumstance finding does not negate the showing a petitioner could not presently be convicted of murder or attempted murder because of changes to section 188 or 189 "because the finding alone does not establish that the petitioner is in a class of defendants who would still be viewed as liable for

---

[10] Petitioner further contends the trial court erred in failing to appoint counsel at the prima facie stage. Because we conclude petitioner established a prima facie case for relief under section 1172.6, we do not address this argument in this opinion.

murder under the current understanding of the major participant and reckless indifference requirements." (*Strong*, at p. 718.) Moreover, "there is nothing in section 1172.6 to indicate that such arguments may be made only after a petitioner has had the prior special circumstance findings set aside in a separate habeas corpus or other proceeding." (*Id*. at p. 714.)

Because of the differences between the pre- and post-*Banks* and *Clark* special circumstance requirements, the Supreme Court stated the changes may "have altered what evidence defense counsel would have sought to introduce[,] . . . might have fundamentally altered trial strategies" (*Strong*, *supra*, 13 Cal.5th at p. 719), and may have affected what jury instructions were requested or given (*id*. at p. 720). "An after-the-fact court review of a pre-*Banks* and *Clark* record does not account for all these differences. . . . And as the Legislature has made explicit in a recent amendment to the predecessor to section 1172.6, a court determination that substantial evidence supports a homicide conviction is not a basis for denying resentencing after an evidentiary hearing. [Citation.] Nor, then, is it a basis for denying a petitioner the opportunity to have an evidentiary hearing in the first place." (*Ibid*.) "For petitioners with pre-*Banks/Clark* findings, no judge or jury has ever found the currently required degree of culpability for a first time. Allowing reexamination of the issue under these circumstances does not permit 'a second bite of the apple' because the changes in the law mean there is now 'a different apple.' " (*Id*. at p. 718.) Thus, neither "the jury's pre-*Banks* and *Clark* findings nor a court's later sufficiency of the evidence review amounts to the determination section 1172.6 requires, and neither set of findings supplies a basis to reject an otherwise adequate prima facie showing and deny issuance of an order to show cause." (*Id*. at p. 720.)

Here, the jury found true the section 190.2, subdivision (a)(17)(A) special circumstance before *Banks* and *Clark* were decided. Pursuant to *Strong*, this finding does not preclude petitioner from stating a prima facie case for relief. (*Strong*, *supra*, 13

16.

Cal.5th at p. 721.) Moreover, a petitioner's prima facie case is not barred even if the evidence is sufficient to support the special circumstance post-*Banks* and *Clark*. (*Id.* at p. 710; *Lewis*, *supra*, 11 Cal.5th at p. 972 [In reviewing the record at the prima facie stage, "a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' "].)

Petitioner's section 1172.6 petition was facially sufficient and alleged the essential facts necessary for relief under section 1172.6. Nothing in the record indicates petitioner is ineligible for relief as a matter of law, and thus, we must remand the matter for the trial court to issue an order to show cause, and, to the extent necessary, conduct an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1) & (3).) We express no opinion on the ultimate resolution on the petition.

## DISPOSITION

The trial court's order denying petitioner's section 1172.6 petition is reversed. On remand, the trial court is directed to issue an order to show cause and, to the extent necessary, hold an evidentiary hearing pursuant to section 1172.6, subdivision (d).